UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    Plaintiff,

v.                                              CASE NO: 6:14-cr-177-Orl-22TBS

BERNARD CORDERO-PEREZ

    Defendant.

## ORDER

This matter comes before the Court on Defendant Bernard Cordero-Perez' Emergency Motion to Exclude Evidence Due to Violation of the Criminal Scheduling Order and Rule 16 of the Federal Rules of Criminal Procedure. (Doc. 81). The United States has filed a response in opposition to the motion (Doc. 83), and on January 23, 2015, the Court held a hearing on the motion (Doc. 88). Now, upon due consideration, Defendant's motion will be **DENIED**.

### Background

In 2013, and possibly earlier, Bernard Cordero-Perez, Ruben Mangual-Aquino, and Yahima Carballosa participated in a credit card theft scheme in the Orlando area. (Doc. 1, ¶ 16, 18, 20). In carrying out the scheme, Cordero-Perez used a credit card skimmer he obtained from Mangual-Aquino to capture and store information belonging to guests at a hotel where he worked as a housekeeper. (Doc. 1, ¶ 14; Doc. 39, pp. 18-20). Using the stolen credit card information from the skimmer, Mangual-Aquino and Carballosa created fake credit cards which they used to purchase gift cards from Walmart. (Doc. 1, ¶ 14).

Several hotel guests victimized by Defendants' scheme complained to the hotel, which reported the thefts to the Orange County Sheriff's Office.  (Doc. 14, p. 20).  After investigators learned that all of the complaining guests stayed in rooms cleaned by Cordero-Perez, they decided to set up a sting operation.  The officers planted a decoy purse with two credit cards and a hidden video camera in one of Cordero-Perez's assigned rooms.  (Id.).  Sure enough, Cordero-Perez was captured on video spotting the purse, removing the credit cards, swiping them with a skimmer he had in his pants pocket, and returning the cards to the purse.  (Id.).  A hotel security officer and Sheriff's investigator confronted Cordero-Perez, who turned over the skimmer and was taken into custody.  (Id.; Doc. 81, ¶¶ 2-7).  Upon questioning, Cordero-Perez revealed the details of the scheme and provided police with his co-conspirators' home address.  (Doc. 81, ¶ 5; PSR, ¶ 21).  A search of the home uncovered a wealth of evidence, including 47 gift cards, 24 counterfeit credit cards, a credit card reader/writer, and receipts for gift cards purchased with fraudulent credit cards.  (PSR, ¶ 22).

On July 23, 2014, a federal grand jury returned a five-count indictment against Cordero-Perez, Mangual-Aquino, and Carballosa.  (Doc. 1).  Count One alleges that Defendants knowingly and with intent to defraud conspired to possess device-making equipment (namely, a credit card skimmer and re-encoder) in violation of 18 U.S.C. § 1029(a)(4), used counterfeit access devices (namely, the fake credit cards) in violation of 18 U.S.C. § 1029(a)(1), and possessed at least 15 counterfeit access devices in violation of 18 U.S.C. § 1029(a)(3).  (Doc. 1, ¶ 8).  Counts Two, Three, and Four charge Defendants with the underlying substantive offenses identified in the conspiracy count.  (Doc. 1, ¶¶ 15-20).  Cordero-Perez is not charged in Counts Three or Four.  (Id.).  Finally, Count Five charges each Defendant with aggravated identity theft under 18

U.S.C. § 1028A(a)(1), because they knowingly transferred, possessed, or used "a means of identification of another person" in committing the three substantive offenses identified in Counts Two through Four.   (Doc. 1 ¶ 22).

On October 15, 2014, Cordero-Perez pled guilty to Counts One and Two of the indictment pursuant to a plea agreement with the government.   (Docs. 39, 45, 49). Later that month, Mangual-Aquino and Carballosa each pled guilty to all counts without an agreement.   (Docs. 62, 68, 72, 73).   On December 23, probation services filed the initial Presentence Investigation Report ("PSR") for Cordero-Perez.   (Doc. 76).   The PSR reaches a base offense level of 18, based on the following calculation:

| | |
|---|---|
| Base offense level for theft and fraud offenses (USSG § 2B1.1(a)(2)) | 6 |
| Loss of $44,620.23 (§ 2B1.1(b)(1)(D)) | +6 |
| Ten or more victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Use of sophisticated means (§ 2B1.1(b)(10)(C)) | +2 |
| Production or trafficking or unauthorized access device or device-making equipment (§ 2B1.1(b)(11)(B)(i)) | +2 |
| Base Offense Level | 18 |

(PSR, ¶ 29).   The PSR also recommends a reduction of three levels total for acceptance of responsibility pursuant to § 3E1.1(a) and (b) of the guidelines, for a Total Offense Level of 15.   (PSR, ¶¶ 37, 38).

On December 29, the government advised probation services that its only objection to the PSR was its failure to include a minor role reduction of two levels pursuant to USSG § 3B1.2.   (Doc. 81, ¶ 20).   On January 5, 2015, the government filed a motion pursuant to USSG § 5K1.1 to afford Cordero-Perez an additional two level reduction in recognition of the "truthful and timely information [he provided] to

investigators which resulted in the discovery of significant incriminating evidence against co-conspirators." (Doc. 79). Cordero-Perez submitted his objections to the PSR on January 7. (Doc. 81, ¶ 21; Doc. 84, ¶ 9). Defendant's objections included the omission of a minor role reduction and an objection to the amount of loss used to calculate the base offense level. (See Doc. 81, ¶ 23).

On January 15, Cordero-Perez' attorney, the Assistant United States Attorney, the case agent, and the probation officer who prepared the PSR met to discuss objections to the PSR pursuant to FED. R. CRIM. P. 32(f)(3). (Doc. 81, ¶ 22). The parties' accounts of what exactly transpired at this meeting diverge. Defense counsel maintains that at the meeting the case agent and the AUSA argued, based on information that had not been furnished to the defense in discovery, that the amount of loss should be $95,000, because Defendants were found in possession of 190 stolen credit card numbers and, under USSG § 2B1.1, Note (3)(F)(i), the amount of loss in cases involving counterfeit or unauthorized access devices "shall not be less than $500 per access device." (Doc. 81, ¶ 24; Doc. 84, ¶ 14). Defense counsel also accuses the case agent and AUSA of arguing that the number of victims exceeded 40 or 50, once all of the banks affected by Defendants' scheme were accounted for. (Doc. 81, ¶ 24; Doc. 84, ¶¶ 15-17). Counsel states that he rejected an offer by the probation officer to score the minor role reduction if Defendant dropped his objection to the amount of loss shown in the PSR. (Doc. 84, ¶ 13).

According to defense counsel, the AUSA sent an email shortly after the meeting "proclaiming 'an intended loss of $95,000 ($500 per card)' and stating 'We also observed during the meeting that there are more than 50 victims.'" (Doc. 84, ¶ 19). The AUSA also sent defense counsel an email attaching files that supported the increased amount of

- 4 -

loss and number of victims.  (Doc. 81, ¶ 26).  Defense counsel accuses the AUSA and the case agent of "ambush[ing]" him with this evidence, which he argues should have been provided in discovery pursuant to FED. R. CRIM. P. 16 and the Scheduling Order. (Doc. 81, ¶¶ 25, 28).

The AUSA disputes defense counsel's account of the Rule 32(f)(3) meeting and he denies that he advocated for any changes to the amount of loss or number of victims. (Doc. 83, p. 3).  According to the AUSA, he simply pointed out that the PSR could have been worse for Defendant had all victims of the conspiracy been accounted for, and had the amount of loss been calculated based on the number of stolen credit card numbers in Defendants' possession.  (Id.).  The AUSA says that after the meeting, he sent defense counsel spreadsheets prepared by the case agent compiling (a) stolen credit card account numbers and related information found on a co-defendant's computer and (b) fraud loss reports the agent had received from credit card companies attributable to credit card account numbers stolen by Defendants.  (Id., p. 1).  The AUSA contends that these spreadsheets were not discoverable under Rule 16 or the Scheduling Order because they were not "Brady, Giglio, or Jencks [Act] material, they were not reports by the agent, they were not material to any defense, and they would not have been introduced in the government's case-in-chief at trial, had there been one."  (Id., p. 1).  Finally, the AUSA adds that, even though the documents were not discoverable under Rule 16, he turned them over to defense counsel the day he received them from the case agent.  (Id., p. 2).

On January 16, the day after the Rule 32(f)(3) meeting, Defendant filed the pending motion to exclude evidence.  (Doc. 81)  On January 21, the Court rescheduled the sentencing hearings for all three Defendants from January 29 to February 19, and referred Defendant's motion to me for a ruling or, if necessary, issuance of a report and

recommendation.  (Docs. 85, 86).  On January 23, I held a hearing on the motion, which was attended by the Defendant, his attorney, and the AUSA.  (Doc. 88).  At the hearing, defense counsel informed the Court that he wished to examine the case agent, and expressed dismay that the case agent was not present to testify.  However, counsel admitted that he failed to inform the AUSA before the hearing that the case agent's presence was necessary.  Both parties presented argument during the hearing, although defense counsel said that he did not want to make any arguments about prejudice because he feared that if he did, the case agent would alter his testimony to undermine those arguments.  At the conclusion of the hearing, I requested a copy of the discovery the government had provided to Cordero-Perez.  I also said I would take Defendants' motion under advisement and either issue a ruling or, if I concluded that the case agent's testimony was necessary to resolve the motion, set a new hearing to obtain the testimony.

After the hearing, the AUSA provided to me four CDs containing all materials turned over to Cordero-Perez in discovery.  One CD contains some two dozen files recovered from Mangual-Aquino's computer that appear to contain readouts from a credit card skimmer.  The files contain over 250 entries dating from September 14, 2010 to August 31, 2013; however, some of the entries appear to be duplicates.  Another CD contains the download from the skimmer Cordero-Perez was carrying when he was arrested; this skimmer contains ten unique entries.  The CDs do not contain the information from credit card companies regarding the amount of loss suffered by any of the victims.

## Legal Standards

Discovery in criminal cases is governed by the federal rules (Federal Rule of Criminal Procedure 16), statute (18 U.S.C. § 3500) and Constitutional law (Brady and Giglio, and their progeny). It is not at all as expansive as in civil cases. United States v. Johnson, 713 F.2d 654, 659 (11th Cir. 1983).

Rule 16 imposes on the government a continuous duty to produce certain material in its "possession, custody, or control" to the defendant upon request. FED. R. CRIM. P. 16; United States v. Jordan, 316 F.3d 1215, 1249 (11th Cir. 2003). Paragraph (a)(1) of the Rule enumerates six categories of information that may be subject to disclosure: a defendant's oral statement; a defendant's written or recorded statement; a defendants prior record; "documents and objects;" "reports of examinations and tests;" and summaries of the testimony of expert witness. Each of the subparagraphs in paragraph (a)(1) limit the circumstances in which disclosure of information falling within a particular category is required. For example, subparagraph (E) requires the government to disclose and make available for inspection and copying "books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items" only when (i) the information is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Similarly, subparagraph (F) requires disclosure of results or reports of physical or mental examinations or scientific tests or experiments in the government's possession if the attorney for the government knows or should know that the item exists and the item is material to preparing the defense or the government intends to use it in its case-in-chief at trial. Evidence is "material" for purposes of Rule 16 if disclosure would enable a defendant "'to significantly alter the

quantum of proof in [his] favor'" at trial.   United States v. Holloway, 971 F.2d 675, 680 (11th Cir. 1992) (quoting United States v. Ross, 511 F.2d 757, 762 (5th Cir. 1975)).

Rule 16 grants courts a great deal of flexibility in enforcing its provisions.   When a party has failed to provide the required disclosures, a Court may "(A) order the party to permit the discovery or inspection [and] set [the] time, place, and manner [for inspection]; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances."   FED. R. CRIM. P. 16(d)(2).   Because "the purpose of Rule 16 is to protect a defendant's right to a fair trial rather than to punish the government's non-compliance," sanctions against the government for harmless nondisclosure are inappropriate.   United States v. Camargo-Vergara, 57 F.3d 993, 998-99 (11th Cir. 1995).   To obtain relief for an alleged discovery violation, a defendant must show "substantial prejudice."   Id.   "Substantial prejudice exists when a defendant is unduly surprised and lacks an adequate opportunity to prepare a defense, or if the mistake substantially influences the jury."   Id.

## Discussion

To obtain the relief he requests–exclusion at sentencing of evidence relevant to determining an appropriate sentence–Defendant must at least show that (1) the information turned over by the AUSA at the Rule 32(f)(3) meeting is discoverable; (2) the AUSA failed to turn the information over; and (3) Defendant was prejudiced by the failure. Defendant has failed to make this showing.   The spreadsheets prepared by the case agent are not discoverable under Rule 16 or the Scheduling Order, and the information the case agent used to prepare the spreadsheets that was not disclosed in discovery is also not discoverable.   Finally, even if Defendant had shown that the government failed to provide discoverable information, he has not explained how he was prejudiced.

Defendant argues that the case agent's spreadsheets are discoverable under Rule 16(a)(1)(E), "Documents and Objects," and 16(a)(1)(F), "Reports of Examinations and Tests." (Doc. 81, ¶¶ 14-16). Rule 16(a)(1)(F) is plainly inapplicable, because it only covers "results or reports" of "physical or mental examination[s]" and "scientific test[s] or experiments[s]." A spreadsheet compiling loss reports from banks and calculating the sum is not a "result" or "report" of an examination or a "scientific test or experiment." The spreadsheets fit better under Rule 16(a)(1)(E), which covers, among other things, "papers," "documents," and "data." Documents or other objects are discoverable under Rule 16(a)(1)(E) only if (i) they are material to preparing the defense, (ii) the government intends to use them in its case-in-chief at trial, and (iii) the item was obtained from or belongs to the defendant.

Clearly, the third factor does not apply because the spreadsheets do not belong to defendant, but were prepared by the case agent. In addition, the government maintains that it would not have introduced the spreadsheets into evidence at trial, and there is no reason to question this representation. None of the offenses charged in the indictment require proof of amount of loss as an element, so the spreadsheet would not help the government establish guilt. The spreadsheets are also hearsay, and the loss amounts included in one spreadsheet are hearsay within hearsay. Accordingly, I find that the spreadsheets do not fall under the second factor because the government had no intention of introducing them at trial. I also find that the spreadsheets do not fall under the first factor as information "material to preparing the defense" because Defendant has not shown that pretrial disclosure of the spreadsheets "'would have enabled [him] to significantly alter the quantum of proof in [his] favor.'" Holloway, 971 F.2d at 680 (quoting United States v. Ross, 511 F.2d 757, 762 (5th Cir. 1975)). Amount of loss was

neither an element of any of the counts in the indictment nor an element of any defense, and the information is hardly favorable to Defendant.

Even if the spreadsheets did fall under one of the three clauses of subparagraph (a)(1)(E), they would still not be discoverable pursuant to paragraph (a)(2), which excludes from disclosure "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." The spreadsheets prepared by the case agent, which organize information gathered during the investigation and make calculations based on some of this information, comfortably fit within this exception. See, e.g., United States v. Robinson, 439 F.3d 777, 779-80 (8th Cir. 2006) (holding that government "reports, memoranda, and internal documents" that set out calculations of defendant's net worth and tax liability were immune from discovery under Rule 16(a)(2)).

Much of the information contained in the spreadsheets prepared by the case agent was ascertainable from the information provided in discovery. For example, the names and credit card numbers recovered from the device-making equipment and the forensic analysis of Mangual-Aquino's computer can be found in text files on one of the CDs provided by the government to defense counsel in discovery. The spreadsheets also incorporate information that was not provided during discovery, specifically, the fraud loss reports from credit card companies. But, as with the spreadsheets themselves, Defendant has failed to show that the loss reports are discoverable under Rule 16. The reports do not belong to Defendant, and given the irrelevance of amount of loss to the offenses charged in the indictment, there is no evidence that the government would have

introduced them as part of its case-in-chief or that early disclosure of loss reports would helped the Defendant prepare for trial.[1]

At the hearing, counsel for Defendant argued that information concerning the amount of loss was material because it would have influenced his client's decision whether or not to plead guilty. But evidence is not "material" under Rule 16 simply because having it would have allowed Defendant to make a better informed decision whether to plead guilty. Cf. United States v. Ruiz, 536 U.S. 622, 629 (2002) ("[T]he more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be. But the constitution does not require the prosecutor to share all useful information with the defendant."). To be sure, the government may not withhold information favorable to a defendant in hopes of extracting a guilty plea. Such conduct would violate Rule 16 and, depending on the nature of the evidence and the circumstances of the case, the defendant's Constitutional rights. See McCann v. Mangialardi, 337 F.3d 782, 787-88 (7th Cir. 2003). Here however, the evidence regarding amount of loss, while relevant to determining the appropriate sentence, is not relevant to the elements of the offenses charged in the indictment or any conceivable defense.

In short, there is no evidence that the government did anything wrong. Assuming arguendo that the spreadsheets were wrongfully withheld by the government, I would still deny Defendant's motion because he has failed to show prejudice. At the hearing, defense counsel was reluctant to explain how his client was prejudiced by receiving the

---

[1] While the information is unquestionably relevant to sentencing, information that may bear on the appropriate sentence if a defendant is convicted but which is immaterial to guilt or innocence, does not fall within the scope of Rule 16. United States v. Wagner, 149 F.R.D. 217, 219 (citing United States v. Barrett, 890 F.2d 855, 865 (6th Cir. 1989)).

- 11 -

spreadsheets after the entry of his guilty plea, citing fears that if the case agent was aware of Defendant's arguments regarding prejudice, he would provide testimony that might undermine those arguments.   The papers counsel has submitted and the statements he made at the hearing suggest two ways in which Defendant might argue he was prejudiced.

First, Defendant suggests that every defendant would want to be apprised of all information relevant to sentencing before deciding whether to enter a guilty plea. (Doc. 81, ¶ 17).   At the hearing, when asked how the case would have proceeded differently were the disputed information disclosed earlier, counsel admitted that Defendant would have pled guilty anyway.   But, counsel suggested that had his client had the additional information, he might have been entered his plea without a plea agreement.   Counsel did not explain why his client would reject an agreement to plead guilty only to counts one and two and instead plead guilty to counts one, two, and five without an agreement.   Count five carries a mandatory two-year minimum sentence, 18 U.S.C. § 1028A(a)(1), which must be served consecutively to any sentence for counts one and two.   If the district judge accepts the base offense level in the PSR and agrees with the adjustments and departures recommended by the parties, Defendant's guideline range, after taking into accounting a two-level reduction for substantial assistance, will be 8-14 months, and the district judge could impose a sentence of probation with home confinement without varying or departing (aside from the two-level substantial assistance reduction) from the guidelines.   See USSG §§ 5B1.1, 5C1.1.   Even if Defendant were found responsible for $95,000 in loss and 50 or more victims, that would only increase his guideline range (again after a two-level downward departure for substantial assistance) to 18-24 months.   There is no reason to believe Defendant would rather go to sentencing

facing a mandatory two-year minimum,[2] to run consecutive to any additional prison sentence on counts one and two, than a guidelines range of 18-24 months or less and a promise by the government (see Doc. 39, ¶ 9) to seek a sentence at the low end of that range.

Second, counsel complains that he was "ambushed" by the new information at the Rule 32(f)(3) meeting. (Doc. 81, ¶¶ 25, 28; Doc. 84, ¶ 15). The Court understands this to mean that the late disclosure of the spreadsheets prejudiced counsel by leaving him inadequate time to prepare for his client's sentencing. Now that sentencing has been postponed until February 19, counsel should have ample time to evaluate his client's situation and prepare arguments on his behalf.

## Conclusion

For all of the foregoing reasons, Defendant's Emergency Motion to Exclude Evidence (Doc. 81) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on January 26, 2015.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

United States Attorney
Counsel for Defendant
Bernard Cordero-Perez

---

[2] To be sure, the Court could depart from the mandatory minimum based on the substantial assistance Defendant provided to the government. But that still means Defendant must beg for mercy at the sentencing hearing to avoid a prison sentence in excess of two years.

- 13 -